# **Exhibit 1**

## Commonwealth of Massachusetts

SUFFOLK, SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. _17-2698_

_Hopsters, LLC_ , PLAINTIFF(S),

v.
_Marlo Marketing_
_Communications, Inc_ , DEFENDANT(S)

### SUMMONS

THIS SUMMONS IS DIRECTED TO _Marlo Marketing Communications, Inc._ . (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the _Suffolk Superior_ Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:
   a. Filing your **signed original** response with the Clerk's Office for Civil Business, _Suffolk Superior_ Court, _3 Pemberton Sq. Boston, MA 02108_ (address), by mail or in person, **AND**
   b. Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: _One International Pl., Suite 350, Boston, MA 02110_

3. **What to include in your response.** An **"Answer"** is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12.** If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at www.mass.gov.courts/case-legal-res/rules of court.

A true copy Attest: Joseph P Casey
Deputy Sheriff Suffolk County
9-5-17

4.  **Legal Assistance**. You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5.  **Required information on all filings**: The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on ___8/28___ , 20 _17_.

Michael Joseph Donovan

Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ , 20___, I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4 (d)(1-5)):

_____

_____

_____

Dated: _____ , 20___     Signature: _____

N.B.   **TO PROCESS SERVER**:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX — BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

**COMMOWEALTH OF MASSACHUSETTS**

SUFFOLK, ss.                                          BUSINESS LITIGATION SESSION
                                                     CIVIL ACTION NO.___17-2690___

|  |  |
|---|---|
| HOPSTERS, LLC | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| MARLO MARKETING COMMUNICATIONS, INC. | ) ) ) |
| Defendants | ) ) ) |



**VERIFIED COMPLAINT**

1.      The plaintiff, Hopsters, LLC ("Hopsters"), is a duly registered Massachusetts limited liability company with a principal place of business located at 50 Rich Valley Road, Wayland, Massachusetts 01778.

2.      The defendant, Marlo Marketing Communications, Inc. ("MMC"), is a duly registered Massachusetts corporation with a principal place of business located at 38 Chauncy Street, Third Floor, Boston, Massachusetts 02110.

**FACTS COMMON TO ALL COUNTS**

3.      Hopsters owns and operates Hopster's Brew and Boards, a beer brewery in Newton, MA. In addition to brewing beer, Hopsters provides a number of services directed to helping customers brew their own craft beers. Hopsters also owns and operates Hopsters Alley in the Boston Public Market.

4.      In early January of 2017, Lee Cooper ("Cooper"), whose wife, Karen, is the owner of Hopsters, contacted Marlo Fogelman ("Fogelman"), President of MMC, regarding public relations and marketing services.

5.      On January 8, 2017, Hopsters and MMC entered into a Standard Agreement for Public Relations and Marketing Services ("Agreement"). See Agreement, attached hereto as **Exhibit A**.

6.      Pursuant to the Agreement, MMC agreed to provide certain communication, public relations and/or marketing services to Hopsters, in connection with Hopsters' plan to open a new location in the Seaport neighborhood of Boston, MA.

7.      MMC's services included analyzing Hopsters' present and potential markets; evaluating Hopsters' competition; meeting with Hopsters personnel; assisting in development of strategies and plans for public relations and communications; pitching media stories, including entertaining media; and implementation of in-house and special events. **Exhibit A** at ¶ 1.

8.      MMC further agreed to "perform the services in a professional manner and devote such of its time to as may be necessary to accomplish the purposes of this Agreement." **Id.**

9.      The Term of the Agreement began on January 9, 2017 and ends on July 8, 2017 (six (6) months). **Id.** at ¶ 2.

10.     The Agreement provides that the Account Service Fee during the Term is $60,000 payable in advance at the rate of $10,000 per month. **Id.** at ¶ 3.

11.     The Agreement provides that Hopsters shall reimburse MMC for "all routine out-of-pocket expenses" and for "general office expenses." **Id.** at ¶ 4.

12.     The Agreement explicitly and unequivocally states, "There is no right to cancel." **Id.** at ¶ 8.

2

13.     Under the Agreement, MMC is not entitled to invoice Hopsters for any services on an hourly basis.

14.     On February 17, 2017, Hopsters agreed to retain MMC for Creative Services related to the creation of two (2) labels for its craft beers, Comet Citra and Newtonian, a Hopsters Brand Guide, and New England IPA website. See Estimate for Creative Services, attached hereto as **Exhibit B**.

15.     The total price for the Creative Services is $9,750. **Id.**

16.     Hopsters paid half of the cost of the Creative Services of $4,875 up front.

17.     Upon information and belief, MMC did begin to perform services in connection with the Agreement, including placement of an article in the March 23, 2017 Boston edition of The Metro.

18.     Upon information and belief, MMC did begin to work on developing labels pursuant to the Creative Services agreement between the parties.

19.     On April 14, 2017, just three (3) months into the Term of the Agreement, Fogelman emailed Cooper and informed him that she was "officially terminating our working relationship with you and Hopsters, effective immediately." See Email from Fogelman, dated April 14, 2017, attached hereto as **Exhibit C**.

20.     Fogelman justified her decision stating, "Your behavior, as outlined by Karen below, is once again, jeopardizing my staff, and I simply will not tolerate it." **Id.**

21.     Fogelman concludes her email by telling Cooper that MMC will not return the unused portion of the $60,000 Account Service Fee because MMC incurred "$40,325 worth of hours on the PR side . . . outstanding still is the work on the website updates we made for you (invoice

attached), as well as the remainder of the label project, which exceeded estimated hours. **So with the money you paid us in advance we are basically even for work paid/completed."** Id.

22.    MMC did not complete its obligations under the Agreement.

23.    MMC did not provide the two (2) labels or the brand guide it created for Hopsters pursuant to the Creative Services agreement.

24.    MMC's termination violates the unequivocal, express language of the contract.

25.    MMC's termination has deprived Hopsters of the public relations and marketing campaign it wanted prior to the opening of its new Seaport location.

26.    MMC is not entitled to invoice Hopsters for services related to public relations or marketing on an hourly basis.

27.    Hopsters, through counsel, attempted to resolve this issue with MMC by requesting that MMC return $25,125, which is the difference between the remaining $30,000 fee for the final three (3) months of the contract (April 14, 2017 to July 8, 2017) minus the outstanding $4,875 on the Creative Services project, and return of the two (2) labels that MMC created for Hopsters.

28.    MMC refused to agree with Hopsters' terms.

29.    On June 7, 2017, Hopsters, through counsel sent MMC a Demand Letter pursuant to G.L. c. 93A outlining MMC's unfair and deceptive acts or practices and requesting that MMC make a reasonable offer of settlement. See Demand Letter, dated June 7, 2017, attached hereto as **Exhibit C**.

30.    MMC failed to make a reasonable offer of settlement within thirty (30) days of receiving the Demand Letter.

## Count I – Breach of Contract

31.    Hopsters incorporates herein the allegations in Paragraphs 1 thru 30.

32.     Hopsters and MMC entered into valid, written contracts for public relations, marketing, and creative services.

33.     MMC failed to perform its obligations under the contracts by terminating the contracts prior to the end of its term or completion of its obligations, by failing to provide the services outlined in the contracts, by improperly billing Hopsters at an hourly rate, and by retaining moneys Hopsters paid up front, which MMC did not earn.

34.     As a result of MMC's breaches, Hopsters has suffered damages in an amount to be proven at trial.

WHEREFORE, Hopsters respectfully requests that this Honorable Court enter judgment in its favor against MMC for breach of contract and grant any other such additional relief as it deems necessary and just.

### Count II – Unjust Enrichment

35.     Hopsters incorporates herein the allegations in Paragraphs 1 thru 34.

36.     Hopsters paid MMC $60,000 for the purpose of retaining MMC's public relations and marketing between January of 2017 and July of 2017 and $4,875 for the purpose of obtaining new labels, a brand guide, and website updates.

37.     On April 14, 2017, MMC terminated its working relationship with Hopsters prior to completing its public relations and marketing services and prior to completing the developing of new labels, a brand guide, and website updates.

38.     MMC has refused to return any portions of the money that Hopsters paid up front for these services.

39.     By failing to perform any of the services for which Hopsters paid and refusing to return any of Hopsters' money, MMC has been unjustly enriched.

WHEREFORE, Hopsters respectfully requests that this Honorable Court enter judgment in its favor against MMC for unjust enrichment and grant any other such additional relief as it deems necessary and just.

### Count III – Fraud

40.    Hopsters incorporates herein the allegations in Paragraphs 1 thru 39.

41.    Hopsters paid $60,000 to MMC in advance for public relations and marketing services and $4,875 for creative services related to development of two (2) labels, a brand guide, and website updates.

42.    On April 14, 2017, Fogelman emailed Cooper to inform him that MMC was terminating its agreement with Hopsters because Cooper's behavior was jeopardizing her staff and that MMC would not be returning the remaining $30,000 Hopsters paid in advance for services from April 14, 2017 to July 8, 2017 because MMC was owed money for approximately $40,325 worth of hours for public relations and marketing services and additional money for MMC's Creative Services "which exceeded estimated hours."

43.    At the time of the termination, Fogelman knew that MMC did not have the right to cancel the agreement under any circumstances and knew that MMC did not have any contractual right to invoice Hopsters for any PR or Marketing Services.

44.    At the time of the termination, Fogelman intentionally made false representations for the sole purpose of improperly and unjustifiably keeping Hopsters' money and not producing any labels or brand guide.

45.    As a result of MMC's conduct, Hopsters has suffered damages in the form of the loss of the $30,000, lost public relations and marketing campaign, and no labels or brand guide.

WHEREFORE, Hopsters respectfully requests that this Honorable Court enter judgment in its favor against MMC for fraud and grant any other such additional relief as it deems necessary and just.

### Count IV – Conversion

46.    Hopsters incorporates herein the allegations in Paragraphs 1 thru 45.

47.    Hopsters paid $60,000 to MMC in advance for public relations and marketing services and $4,875 for creative services related to development of two (2) labels and a brand guide.

48.    MMC has refused to return any portions of the $60,000 or the $4,875 Hopsters paid it for services despite improperly terminating the Agreement and refusing to produce the labels and the brand guide.

49.    MMC improperly claims that it is entitled to keep all of the money Hopsters paid it for services.

50.    MMC has no right to retain Hopsters money without completing the services.

51.    MMC has intentionally refused to return any portions of the money Hopsters paid it for services.

52.    As a result of MMC's improper conduct, Hopsters has suffered damages in the form lost money, loss of use of the money, no labels, no brand guide, and the loss of a public relations and marketing campaign prior to the opening of its new location in the Seaport.

WHEREFORE, Hopsters respectfully requests that this Honorable Court enter judgment in its favor against MMC for conversion and grant any other such additional relief as it deems necessary and just.

### Count V – Violation of G.L. c. 93A, § 11

53.    Hopsters incorporates herein the allegations in Paragraphs 1 thru 52.

54.     Hopsters and MMC are Massachusetts businesses and are engaged in trade or commerce.

55.     The transaction between Hopsters and MMC was conducted in a business context.

56.     MMC has engaged in unfair or deceptive acts or practices by improperly retaining Hopsters' $60,000 without completing the public relations and marketing services under the Agreement and by failing to produce two (2) labels and a brand guide.

57.     MMC has engaged in unfair and deceptive acts or practices by improperly and unjustifiably terminating its agreements with Hopsters and refusing to return unused portions of the money Hopsters paid to it for services.

58.     MMC has engaged in unfair and deceptive acts or practices by intentionally making false representations to Hopsters regarding terminating its agreements, invoicing Hopsters for services at an hourly rate, and refusing to return any of the money Hopsters paid it for services.

59.     MMC's engaged in unfair and deceptive acts or practices willfully and knowingly.

60.     As a result of MMC's knowingly and willfully engaging in unfair and deceptive acts or practices, Hopsters has suffered damages in the form of lost money, lost public relations and marketing, and no labels, brand guide, or website updates.

WHEREFORE, Hopsters respectfully requests that this Honorable Court enter judgment in its favor against MMC for knowingly and willfully violating G.L. c. 93A, § 11 and grant any other such additional relief as it deems necessary and just.

## JURY DEMAND

The plaintiff, Hopsters, LLC, demands a trial by jury on all issues so triable.

Respectfully submitted,
**HOPSTERS, LLC**
By its attorneys,

Kenneth B. Walton, BBO #562174
Ken.Walton@lewisbrisbois.com
Lindsey D. Smith, BBO #688614
Lindsey.Smith@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
One International Place, 3rd Floor
Boston, MA 02110
T: (857) 313-3950
F: (857) 313-3951

Date: August _16_, 2017

## **VERIFICATION**

I, Lee Cooper, state that I am an agent of Hopsters, LLC and that I have read the allegations set forth in the Verified Complaint and Demand for Jury Trial, and that they are true to the best of my knowledge, information and belief.

Date: __8/2/17__ , 2017

Lee Cooper

## CERTIFICATE OF SERVICE

I, Lindsey D. Smith, hereby certify that on this _16th_ day of August, 2017 I served a copy of this document, via email and first class mail, postage prepaid, on the following:

C. Max Perlman, Esq.
Hirsch Roberts Weinstein, LLP
24 Federal Street, 12th Floor
Boston, MA 02210
max@hrwlawyers.com

Lindsey D. Smith

# Exhibit A

*marlo marketing/communications*

**STANDARD AGREEMENT
FOR
PUBLIC RELATIONS AND MARKETING SERVICES**

This Standard Agreement is entered into on January 8, 2017, by and between marlo marketing/communications ("Agency"), located at 38 Chauncy Street, Boston, MA, and Hopsters ("Client"), located at 292 Centre Street, Newton, MA 02458.

Whereas, the Client desires to engage the Agency to perform certain services for the Client, pursuant to the terms and conditions stated in this Agreement.

Now, therefore, in consideration of the foregoing and the mutual promises contained in this Agreement, the parties agree, as follows:

*1. Services.* The Agency agrees to provide certain communication, public relations and/or marketing services to Client; such services may include the following: analyzing Client's present and potential markets; evaluating Client's competition; meeting with Client and designated staff; assisting in development of strategies and plans for public relations and communications; pitching media stories, including entertaining media; and implementation of in-house and special events. Agency agrees to perform the services in a professional manner and devote such of its time to as may be necessary to accomplish the purposes of this Agreement.

*2. Term.* The Term of this Agreement is six (6) months, beginning on January 9, 2017, and ending on July 8, 2017.

*3. Account Service Fees.* The annual Account Service Fee during the Term is $60,000.00, payable in advance at the rate of $10,000.00 per month. Retainer for the first month's service fee is due upon commencement of this contract.

*4. Reimbursement of Expenses.* Client agrees to reimburse Agency for all routine out-of-pocket expenses, including: mileage, tolls, transportation, meals, photography, major mailings, shipping, out-of-house photocopies, industry-specific publication subscriptions newsclip service, and fees for releases, licenses, permits clearances and other authorization to use photographs, images, names, likenesses or intellectual property held by others. Client further agrees to reimburse Agency for general office expenses, including routine telephone and fax charges, in-house photocopies, one-off postage charges, and all other materials at a flat rate of $150 per month. Agency will endeavor to bill expenses monthly. All bills shall be due upon receipt.

*5. Client Approvals.* Agency has established a company-wide policy to ensure that initiatives requiring client approvals or expenditures are executed on time and within budget. Agency will require written client sign-off on initiatives requiring significant planning or production time including: design items requiring production or manufacture; client events or media trips; and all expenditures over $100. In each instance, Agency will forward you an estimate of cost and delivery date that will include a deadline for your approval, after which we cannot guarantee delivery. No project will be executed without your signed or oral approval. If oral approval is given, the Agency will send an email recapping the conversation, to which no reply within three days indicates Client agreement/acceptance. To ensure accurate tracking, Agency will archive related emails, including vendor estimates, agency correspondence and work orders.

*6. Meals/Entertainment Expenses.* As part of our work on your behalf, Agency needs to be dining and spending time in your restaurants on a regular basis. As such, it is helpful if Agency is provided with a reloadable gift card. Agency will use this when bringing in media to introduce to the restaurants, as well as to visit regularly. When Agency dines with the media, bill and gratuity will be covered by Client; When Agency dines without media, Agency covers gratuity; When Agency sends in media to experience the restaurant on their own with a guest, the check (food and drink) are covered, but the media is asked to cover gratuity.

*7. Late Fees and Default.* Any payment due from Client to Agency and not received by Agency on the date of payment is due, shall accrue interest at the rate of 1.5% per month until paid, unless such interest is reduced or waived by Agency. Agency reserves the right to suspend its services for Client at any time while sums are delinquent. Agency may also terminate this Agreement if any outstanding sums are not paid within fourteen (14) days of written notice to Client. Upon any such termination, Client shall also be responsible for the Account Service Fee and all expenses for the full month in which Agency's notice of termination is given. Client shall be responsible for all costs of collection incurred by Agency under this Agreement, including reasonable legal fees and expenses and court costs.

*8. Right to Cancel.* There is no right to cancel.

*marlo marketing/communications*

**9. Confidentiality.** Agency acknowledges its responsibility, both during and after the term of its appointment, to use reasonable efforts to preserve the confidentiality of proprietary information or data developed by Agency on behalf of Client or disclosed by Client to Agency.

**10. Client Approval.** Agency agrees that all communications that represent Client are to be reviewed and approved for release by Lee Cooper or another authorized representative of Client.

**11. Facts Supplied by Client; Indemnity.** It is understood that Agency is not responsible for facts supplied to it by Client or factual matters included in material prepared by Agency and approved by Client. Agency does reserve the right, however, to not communicate or release information that it believes to be false, unfounded, unfair, misleading, slanderous, libelous, defamatory, or prohibited by court order, or may, in its judgment, harm Agency. Client agrees to release, exonerate, indemnify and hold harmless Agency from and against any and all losses, claims, damages, expenses (including reasonable legal fees and expenses or court costs) or liabilities which Agency may incur arising from information, representation, reports or releases furnished or approved by Client for release by Agency.

**12. Notices.** Any notice hereunder shall be in writing, sent by recognized overnight messenger service, such as FedEx, or certified mail, return receipt requested, with all fees prepaid, to the appropriate address above. Notices shall be deemed given upon actual receipt or refusal to accept delivery; for certified mail, if there is no signed receipt or refusal, notice shall be deemed given three (3) business days after deposit with the US Postal Service.

**13. Governing Law; Consent to Jurisdiction.** This Agreement shall be governed by, and construed in accordance with the laws of the Massachusetts. To the fullest extent permitted by law, Client consents and submits to the jurisdiction of the state and federal courts located in Boston, Massachusetts in connection with any actions or proceedings brought against Client by Agency arising out of or relating to this Agreement and agrees that all claims in respect of any such action or proceeding may be heard and determined in any such court. Client hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

**15. Miscellaneous.** This Agreement may be signed in counterparts, each of which shall be deemed an original but all of which, together, shall constitute one and the same agreement. Any changes to this Agreement shall be in writing. This Agreement constitutes the entire agreement between the parties and supercedes their prior agreements and understandings.

Executed as a sealed instrument.

| | |
|---|---|
| **CLIENT:**<br>**HOPSTERS** | **AGENCY:**<br>**MARLO MARKETING COMMUNICATIONS**<br>**INCORPORATED** |
| By:    Lee Cooper<br>Owner | By:  Marlo Fogelman<br>Principal |

*Page 2*

# Exhibit B



Creative Services
marlo marketing
38 Chauncy Street, 3rd Floor
Boston, MA 02111
design@marlomarketing.com
617 375 9700
marlomarketing.com

**Client**

Hopsters
292 Centre Street
Newton MA 02458

| Estimate No. | **HOP-17001** |
| --- | --- |
| Date | 02/17/2017 |

# ESTIMATE

| Item | Description | Price/Unit | Qty | Price |
| --- | --- | --- | --- | --- |
| • 2 Sub-Brand Designs | • 2 Sub-Brand Mood Boards: Creation of 1 mood board each for Comet Citra and Newtonian branding. Provide up to 2 drafts of design refinements. (4hrs)<br><br>• Sub-Brand Design: Creation of a sub-brand look and feel for Comet Citra and Newtonian. Provide up to 2 drafts of design refinements. (56hrs) | $125.00 | 60 | $7,500.00 |
| • Hopsters Brand Guide | Create guidelines for Hopsters brand and sub-brands. These guidelines will outline logo usage, color palette, typographic hierarchy, and visual relationships between the primary and secondary brands. Final guidelines provided in the form of PDF document. (10hrs) | $125.00 | 10 | $1,250.00 |
| • New England IPA webpage | Design of interim page for current website, containing New England IPA informational content. Layout files provided to current website manager for implementation. (8hrs) | $125.00 | 8 | $1,000.00 |
| | | **Total** | | **$9,750.00** |

All ready paid $ 4,875.00

**COST ALLOWANCES**
The above design and programming costs are allowances and are subject to change based on the project's final scope, functionality and overall needs. A firm estimate will be provided to and must be approved by the client if the actual scope changes from what is stated above. Printing costs are not included and will be estimated once final specs are determined.

**CONTENT**
Client to provide all text content and photography. Stock photography/illustration can be sourced if necessary; royalty-free licensing fees not included. Copywriting or custom photography/illustration not included. marlo can provide copywriting and/or custom photography for an additional fee, if desired.

SCHEDULE
Upon acceptance of this proposal, a recommended schedule for creative and production will be presented. The schedule will outline target dates, but the completion of the stated tasks will be dependent on the client's timely feedback by the dates noted. Any delay in feedback/approvals will be subject to the delay of subsequent tasks.

# Exhibit C



LEWIS BRISBOIS BISGAARD & SMITH LLP

Kenneth Walton
One International Place, Suite 350
Boston, Massachusetts 02110
Ken.Walton@lewisbrisbois.com
Direct: 857.313.3936

June 7, 2017

**VIA EMAIL AND FIRST CLASS MAIL**

C. Max Perlman, Esq.
Hirsch Roberts Weinstein, LLP
24 Federal Street, 12th Floor
Boston, MA 02110
Email: max@hrwlawyers.com

Re:   **Marlo Marketing Communications, Inc. - G.L. c. 93A Demand Letter**

Dear Attorney Perlman:

I represent Lee Cooper ("Cooper") and Hopsters, Inc. ("Hopsters") regarding a dispute involving your client Marlo Fogelman ("Fogelman") and Marlo Marketing Communications, Inc. ("MMC"). On April 14, 2017, Fogelman contacted Cooper to inform him that MMC was terminating its Agreement with Hopsters to provide Public Relations and Marketing Services (the "Agreement") and would not be returning approximately $30,000 remaining from the $60,000 retainer Cooper paid. Fogelman's conduct is not only inappropriate, but is also in direct violation of the Agreement. Fogelman's refusal to refund Hopsters' retainer constitutes an unfair and deceptive act or practice in violation of Massachusetts General Laws Chapter 93A ("Chapter 93A") for which Hopsters may recovery double or treble damages, plus attorneys' fees and costs. Additionally, because Fogelman decided to terminate the Agreement, the scope of which was to develop a Public Relations and Marketing campaign on behalf of Hopsters, during the middle of the term, Hopsters has been deprived of any benefit from MMC's services, has had to delay the Grand Opening of its Seaport business, and therefore, is entitled to a refund of the entire $60,000 retainer. Hopsters is also entitled to recover damages due to delays resulting from Fogelman's conduct. Please accept this letter as a formal Chapter 93A Demand Letter pursuant to G.L. c. 93A, § 11.

**Factual Background**

On January 8, 2017, MMC and Hopsters entered into the Agreement for the purpose of developing a public relations and marketing campaign leading up to the opening of Hopsters' new Seaport location. See Agreement, attached hereto as **Exhibit A**. The Agreement provides that MMC will "provide certain communication, public relations and/or marketing services to" Hopster and that MMC "agrees to perform the services in a professional manner and devote such of its time to as may be necessary to accomplish the purposes of this Agreement." **Ex. A** at ¶ 1. The Agreement

C. Max Perlman, Esq.
June 7, 2017
Page 2

states that the term is "six (6) months, beginning January 9, 2017, and ending on July 8, 2017." **Id.** at ¶ 2. In return for MMC's services, Hopsters agreed to pay an Account Service Fee during the "Term" at a rate of $10,000 per month for a total of $60,000. **Id.** at ¶ 3. Additionally, Hopsters agreed to reimburse MMC for "all routine out-of-pocket expenses" and for "general office expense." **Id.** at ¶ 4. The Agreement does not provide that MMC is entitled to invoice Hopsters on an hourly basis. Further, the Agreement expressly and unequivocally states that "[t]here is no right to cancel." **Id.** at ¶ 8.

Subsequently, MMC and Hopsters also entered into a Creative Services Agreement wherein MMC agreed to provide "2 Sub-Brand Designs, Hopsters Brand Guide, and New England IPA webpage" for a flat fee of $9,750.00. See Estimate, dated February 17, 2017, attached hereto as **Exhibit B**. Cooper paid MMC $60,000 up front, representing the entire retainer amount called for in the Agreement and prepaid $4,875 of the $9,750 for the Creative Services Agreement. In total, MMC has obtained $64,875 from Hopsters in connection with these services.

On April 14, 2017, Fogelman emailed Cooper informing him that MMC was terminating the Agreement and retaining the entire $60,000 retainer amount. See Email from Marlo Fogelman, dated April 14, 2017, attached hereto as **Exhibit C**. In the email, Fogelman states that

> "So far we have been paid for 50% of the creative project ($4,875.00). We have already billed $40,325 worth of hours on the PR side. In addition, outstanding still is the work on the website updates we made for you (invoice attached) as well as the remainder of the label project, which exceeded estimated hours. So with the money you paid us in advance we are basically even for work paid/completed."

**Ex. C**. As the basis for Fogelman's decision to terminate the Agreement, she states that Cooper's "behavior, as outlined by Karen [Wong] below, is once against jeopardizing my staff, and I simply will not tolerate it." **Id.** Karen Wong's email states that "Lee has officially gone off the rails" and that "he was a COMPLETE AND UTTER asshole" because he did not like one of the label designs MMC prepared pursuant to the Creative Services Agreement. **Id.** In response to Fogelman's email, Cooper requested the return of the remaining $30,000 retainer and the two label files. See Email from Cooper, dated April 14, 2017, attached hereto as **Exhibit D**. A few days later, on April 17, 2017, Cooper's attorney, John P. Connell, emailed MMC's counsel directly to request that the parties discuss a resolution of this matter. See Email from John P. Connell, dated April 17, 2017, attached hereto as **Exhibit E**. You have not responded to Attorney Connell's request.

**Demand**

MMC's termination of the Agreement, refusal to return the remaining $30,000 retainer, failure to provide Hopsters with the two (2) labels, and overall failure to complete the public relations and marketing campaign it promised to complete on behalf of Hopsters constitute unfair and deceptive acts or practices, which violate Chapter 93A, § 11. "To be successful, a plaintiff bringing a claim under § 11 must establish (1) that the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice, as defined by G. L. c. 93A, § 2, or the regulations promulgated thereunder; (2) a loss of money or property suffered as a result; and (3) a causal

C. Max Perlman, Esq.
June 7, 2017
Page 3

connection between the loss suffered and the defendant's unfair or deceptive method, act, or practice." Auto Flat Car Crushers, Inc. v. Hanover Insurance Company, 469 Mass. 813, 820 (2014); see also Smith v. Binder, 20 Mass. App. Ct. 21 (1985).

Emails exchanged between Fogelman and Cooper prior to executing the Agreement indicate that Fogelman was aware that Cooper was interested in developing a "buzz" surrounding the opening of a new Hopsters location in the Seaport. The Agreement clearly states that its term is six (6) months, from January to July, and that neither party has a right to cancel. The Agreement does not state anywhere that MMC is entitled to invoice Hopsters for hourly services. Further, the Agreement does not mention, incorporate, or otherwise reference the Creative Services Agreement.

Contrary to Fogelman's position that the parties "are basically even," the facts indicate that MMC is not entitled to invoice its services at an hourly rate and, in fact, expressly obligates MMC to "perform the services in a professional manner and devote such of its time to as may be necessary to accomplish the purposes of this Agreement." The fact that Karen Wong and other MMC employees did not like a client's criticism of one of the two label designs, a project covered by a separate agreement, is bogus and does not justify MMC's termination of the Agreement and withholding the remaining $30,000 of the retainer. Additionally, Fogelman's suggestion that MMC may keep the retainer toward satisfying any payments due under the Creative Services Agreement is not supported by either agreement between the parties and a further indication of MMC's unfair and deceptive conduct.

MMC's unfair and deceptive conduct has caused Cooper and Hopsters to suffer damages in the form of the improperly withheld $30,000 retainer, loss of use of the two (2) label Hopsters purchased but did not receive, loss of benefit of the ongoing public relations and marketing campaign, damage to the Hopsters brand name, delays in the opening of the new Hopsters location in the Seaport, and interference with Hopsters' business interests. Pursuant to Chapter 93A, Cooper and Hopsters hereby demand that Fogelman and MMC make a reasonable settlement offer within thirty (30) days of receipt of this letter. Failure to make a reasonable settlement offer within the timeframe prescribed by Chapter 93A will subject Fogelman and MMC to liability at trial and possible double or treble damages, attorney's fees and costs. In addition, if a reasonable settlement offer is not received within thirty (30) days, Hopsters will file the attached lawsuit, **Exhibit F**.

Sincerely,

Kenneth Walton of
LEWIS BRISBOIS BISGAARD & SMITH LLP

KW
Encls.
cc:    Lee Cooper, Hopsters, Inc.

C. Max Perlman, Esq.
June 7, 2017
Page 4

Lindsey D. Smith, Esq.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                                                          SUPERIOR COURT

HOPSTERS, LLC

Plaintiff and Defendant-in-Counterclaim,

v.                                                                    Civil Action No. 2017-2698

MARLO MARKETING
COMMUNICATIONS, INC.

Defendant and Plaintiff-in-Counterclaim.

## NOTICE OF APPEARANCE

Kindly enter the appearance of C. Max Perlman on behalf of the Defendant, Marlo

Marketing Communications Inc., in the above-reference case.

**MARLO MARKETING COMMUNICATIONS
INC.,**

C. Max Perlman (BBO No. 630395)
*max@hrwlawyers.com*
Hirsch Roberts Weinstein LLP
24 Federal Street, 12th Floor
Boston, Massachusetts 02110
(617) 348-4300 (telephone)
(617) 348-4343 (fax)

September 25, 2017

## CERTIFICATE OF SERVICE

I, C. Max Perlman, hereby certify that I delivered a copy of this document to counsel of
record for the Plaintiff by mail on September 25, 2017, with a courtesy copy via email.

C. Max Perlman

1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                                              SUPERIOR COURT

HOPSTERS, LLC

Plaintiff and Defendant-in-Counterclaim,

v.                                                           Civil Action No. 2017-2698

MARLO MARKETING
COMMUNICATIONS, INC.

Defendant and Plaintiff-in-Counterclaim.

## NOTICE OF APPEARANCE OF CHARLOTTE M. PETILLA

Please enter the appearance of Charlotte M. Petilla as counsel on behalf of Defendant

Marlo Marketing Communications Inc.

**MARLO MARKETING COMMUNICATIONS INC.,**

Charlotte M. Petilla (BBO No. 671126)
*cpetilla@hrwlawyers.com*
Hirsch Roberts Weinstein LLP
24 Federal Street, 12th Floor
Boston, Massachusetts 02110
(617) 348-4300 (telephone)
(617) 348-4343 (fax)

September 25, 2017

## CERTIFICATE OF SERVICE

I, Charlotte M. Petilla, hereby certify that I delivered a copy of this document to counsel
of record for the Plaintiff by mail on September 25, 2017, with a courtesy copy via email.

Charlotte M. Petilla

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                                    SUPERIOR COURT

---

HOPSTERS, LLC

Plaintiff and Defendant-in-Counterclaim,

v.

MARLO MARKETING
COMMUNICATIONS, INC.

Defendant and Plaintiff-in-Counterclaim,

---

Civil Action No. 2017-2698

## ANSWER AND COUNTERCLAIMS

Pursuant to Rules 8, 12, and 13 of the Massachusetts Rules of Civil Procedure, the

Defendant and Plaintiff-in-Counterclaim Marlo Marketing Communications, Inc. ("Marlo

Marketing") submits this Answer and Counterclaims.

## ANSWER

Marlo Marketing hereby answers the numbered paragraphs of the Complaint:

1.      Marlo Marketing lacks knowledge or information sufficient to form a belief as to

the truth of the remaining allegations in paragraph 1.

2.      Admitted.

## Facts Common to All Counts

3.      Marlo Marketing lacks information sufficient to form a belief as to the truth of

allegations in Paragraph 3.

4.      Marlo Marketing admits that Lee Cooper ("Cooper") contacted Marlo Fogelman

in January of 2017 regarding public relations and marketing services, but lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4.

5.    Denied.

6.    Denied.

7.    Denied.

8.    Denied.

9.    Denied.

10.    Denied.

11.    Denied.

12.    Denied.

13.    Denied.

14.    Marlo Marketing admits that it provided Plaintiff an estimate for the services set forth in Exhibit B to the Complaint.  Marlo Marketing denies the remaining allegations in paragraph 14.

15.    Marlo Marketing admits that the estimate for the services described in Exhibit B to Complaint totals $9,750.  Marlo Marketing denies the remaining allegations in paragraph 15.

16.    Marlo Marketing admits that Plaintiff paid Marlo Marketing half of the estimate set forth in Exhibit B to Complaint, $4,875.00, for the services described therein up front. Marlo Marketing denies the remaining allegations in paragraph 16.

17.    Marlo Marketing admits that it provided Plaintiff with marketing and public relations services.  Marlo Marketing denies the remaining allegations in Paragraph 17.

18.    Marlo Marketing admits that it began the label design work described in Exhibit B to the Complaint.  Marlo Marketing denies the remaining allegations in paragraph 18.

19.    Marlo Marketing admits that Ms. Fogelman sent Mr. Cooper an e-mail on April 14, 2017 and that in that e-mail Ms. Fogelman wrote: "Per my explicitly clear agreement in

2

taking you on as a client again, I am writing to let you know that we are officially terminating

our working relationship with you and Hopsters, effective immediately." Marlo Marketing

denies the remaining allegations in paragraph 19.

20.    Marlo Marketing admits that in the April 14, 2017 e-mail Ms. Fogelman wrote:

"Your behavior, as outlined by Karen below, is once again jeopardizing my staff, and I simply

will not tolerate it." Marlo Marketing denies the remaining allegations in paragraph 20.

21.    Marlo Marketing admits that in the April 14, 2017 e-mail Ms. Fogelman wrote:

> So far we have been paid for 50% of the creative project
> ($4,875.00). We have already billed $40,325 worth of hours on the
> PR side. In addition, outstanding still is the work on the website
> updates we made for you (invoice attached) as well as the
> remainder of the label project, which exceeded estimated hours. So
> with the money you paid us in advance we are basically even for
> work paid/completed.

Marlo Marketing denies the remaining allegations in paragraph 21.

22.    Denied.

23.    Denied.

24.    Denied.

25.    Denied.

26.    Denied.

27.    Denied.

28.    Marlo Marketing admits that the parties did not resolve their disputes, but

otherwise denies the remaining allegations in paragraph 28.

29.    Marlo Marketing admits that on June 7, 2017, Plaintiff, through counsel, sent

Marlo Marketing the letter attached to the Complaint as Exhibit C. Marlo Marketing denied the

remaining allegations in paragraph 29.

30.    Denied.

## **Count I – Breach of Contract**

31.    Marlo Marketing repeats and reasserts each of its responses to Paragraphs 1 through 30.

32.    Denied.

33.    Denied.

34.    Denied.

## **Count II – Unjust Enrichment**

35.    Marlo Marketing repeats and reasserts each of its responses to Paragraphs 1 through 34.

36.    Denied.

37.    Denied.

38.    Denied.

39.    Denied.

## **Count III - Fraud**

40.    Marlo Marketing repeats and reasserts each of its responses to Paragraphs 1 through 39.

41.    Denied.

42.    Denied.

43.    Denied.

44.    Denied.

45.    Denied.

## Count IV Conversion

46.     Marlo Marketing repeats and reasserts each of its responses to Paragraphs 1 through 45.

47.     Marlo Marketing admits that Plaintiff paid Marlo Marketing $60,000 for public relations and marketing services and $4,875 for services set forth in Exhibit B to the Complaint. Marlo Marketing denies the remaining allegations of paragraph 47.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Denied.

52.     Denied.

## Count V – Violation of G.L. c. 93A, § 11

53.     Marlo Marketing repeats and reasserts each of its responses to Paragraphs 1 through 52.

54.     Admitted.

55.     Marlo Marketing admits that its dealings with Plaintiff were conducted in a business context, but otherwise denies the allegations in Paragraph 55.

56.     Denied.

57.     Denied.

58.     Denied.

59.     Denied.

60.     Denied.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff has failed to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its own breaches of its contractual and legal obligations.

## THIRD AFFIRMATIVE DEFENSE

Defendant was privileged to act in the manner in which it acted.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff has waived its claims and/or is estopped from bringing them.

## FIFTH AFFIRMATIVE DEFENSE

The doctrine of unclean hands bars Plaintiff's claims, in whole or in part.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's fraud bars its claims.

## SEVENTH AFFIRMATIVE DEFENSE

The doctrine of release bars Plaintiff's claims.

## EIGHTH AFFIRMATIVE DEFENSE

If Plaintiff incurred damages, which is expressly denied, such damages were caused solely by Plaintiff's own conduct, precluding recovery.

## NINTH AFFIRMATIVE DEFENSE

If Plaintiff incurred damages, which is expressly denied, it is a result of Plaintiff's failure to mitigate damages.

## TENTH AFFIRMATIVE DEFENSE

If Plaintiff incurred damages, which is expressly denied, such damages are to be reduced by amounts owed by Plaintiff to Marlo Marketing.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are in violation of Mass. G. L. ch. 231, sec. 6F.

## COUNTERCLAIMS

### Introduction

1.     Before providing services to Defendant-in-Counterclaim Hopsters LLC ("Hopsters") in 2017, Plaintiff-in-Counterclaim Marlo Marketing Communications, Inc. ("Marlo Marketing") demanded assurances from Lee Cooper, Hopsters' founder and owner, that he would not, as he had in the past, mistreat or abuse Marlo Marketing's staff.  Mr. Cooper agreed, stating "I'll check my behavior, however, I want to be active in the strategic direction-with the caveat that you tell me to f*ck off anytime and I'll also pay you in advance so I have ***no redress.***"  Yet, after Mr. Cooper, in violation of that promise, berated Marlo Marketing staff for a beer can design he himself had approved, forcing Marlo Marketing to terminate their relationship, he demanded that Marlo Marketing refund Hopsters the same amounts for which he already pledged that he would have no redress.  Additionally, since then, Hopsters has refused to pay an outstanding balance for two beer can designs, and, without Marlo Marketing's permission, began using both designs, which infringes Marlo Marketing's copyright rights in

7

those designs.  Doubling down on its wrongdoing, Hopsters sued Marlo Marketing, asserting a number of meritless claims, in an effort to extort money from Marlo Marketing.

2.      Marlo Marketing brings the following counterclaims to recover damages for Defendant-in-Counterclaim's breach of contract, unjust enrichment, fraud, promissory estoppel, abuse of process, violation of c. 93A, and copyright infringement.

**Parties, Jurisdiction and Venue**

3.      Plaintiff-in-Counterclaim Marlo Marketing Communications, Inc. is a Massachusetts corporation with a principal place of business in Boston, Massachusetts.

4.      On information and belief, Defendant-in-Counterclaim Hopsters LLC is a Massachusetts limited liability company with a principal place of business in Wayland, Massachusetts.

5.      The Superior Court has original subject matter jurisdiction of this action pursuant to G.L. c. 212, § 4 and G.L. c. 214, § 1.

6.      This Court has personal jurisdiction over the Defendant-in-Counterclaim pursuant to G.L. c. 223A.

7.      Venue is appropriate in Suffolk County pursuant to G.L. c. 223, § 1 as Marlo Marketing's principal place of business is in Suffolk County.

**Facts**

**"I'll also pay you in advance so I have no redress."**

8.      On January 6, 2017, Mr. Cooper, on behalf of Hopsters, contacted Marlo Marketing's principal, Marlo Fogelman, stating "I just made a couple of mill selling a bit of Hopsters" and that he wanted to "create a buzz" about two beers—Comet Citra and Newtonian.

9.      What Mr. Cooper did not initially tell Marlo Marketing is that, in or around early December 2016, he became embroiled in a Twitter war with the owner of Craft Beer Cellar (CBC), a beer retailer, over a CBC memo leaked to the public blacklisting certain breweries, including Hopsters.

10.      Mr. Cooper's Twitter war resulted in negative publicity for Hopsters and created an opportunity for commentators to post comments criticizing Mr. Cooper and Hopsters' beer.

11.      Despite the negative publicity, Mr. Cooper insisted that he wanted "lines out" Hopsters doors, "Star F*ckers" and "a few Pied Pipers – beer influencers and not Jenny Johnson and that tool she hangs out with." He acknowledged "its going to be 10's of thousands" of dollars that he would have to pay Marlo Marketing to achieve those results.

12.      In essence, Mr. Cooper did not just want Marlo Marketing to "create a buzz" about two of Hopsters' beers; he wanted Marlo Marketing to wholly rehabilitate, reposition, and refine Hopsters' brand.

13.      To that end, Marlo Marketing initially proposed a large scale, long-term rebranding effort. Mr. Cooper demurred, writing: "I like what you said, however the big branding stuff I'm not convinced unless we get at it through the menusha [sic] of organic small twist and turn tactics that make us edgy, urban and relevant. Think Backlash Beer company just not so juvenile."

14.      Ultimately, Mr. Cooper agreed to a short-term project for $60,000 to comprehensively assess Hopsters' public relations needs and increase the visibility of Hopsters' Comet Citra and Newtonian beers, on the condition that Marlo Marketing generate "cool, original, ideas and [] a pioneer narrative that makes Hopsters authentic and me a bad ass!"

15.     Marlo Marketing warned Mr. Cooper that it would cost far more than $60,000 to wage the kind of public relations campaign necessary to realize his demands.  Instead of balking at Marlo Marketing's warning, Mr. Cooper proposed that he and Marlo Marketing meet.

16.      Marlo Marketing also told Mr. Cooper that Marlo Marketing would only work with him on the condition that he not mistreat Marlo Marketing staff, as he had done during a prior engagement.

17.     Mr. Cooper, acknowledging his inappropriate behavior, responded: "I hear you. A lot of dedicated ex employees and their close friends hate me with some venhum [sic]. However if I was a nice guy in the early days my business would not be successful."

18.     Marlo Marketing then sent Mr. Cooper a draft contract.

19.     Mr. Cooper responded: "I will swing by your office on Tuesday afternoon with beer and check.  I'll check my behavior, however, I want to be active in the strategic direction – *with the caveat that you tell me to f\*ck off anytime and I'll also pay you in advance so I have no redress."* ("Forfeiture Provision")  A copy of that communication is attached hereto as <u>Exhibit 1</u>.

20.     Marlo Marketing accepted Mr. Cooper's proposal.

21.     Hopsters subsequently gave Marlo Marketing a check for $60,000, which Marlo Marketing accepted with the understanding that Hopsters would forfeit the entire $60,000 retainer if Mr. Cooper mistreated Marlo Marketing staff.

### The Beer Can Label Project

22.     Between January and April of 2017, Marlo Marketing provided Hopsters with superior public relations services, including drafting a comprehensive public relations plan in January of 2017.   A copy of that plan is attached hereto as <u>Exhibit 2</u>.

23. Even before the proposed public relations plan was presented, Marlo Marketing strongly recommended that Hopsters redesign the beer can labels for its Comet Citra and Newtonian beers, based on both its in-house knowledge as well as the opinion of industry experts with whom it consulted.

24. In fact, Mr. Cooper initially raised the issue of the beer can designs on January 10, 2017, telling Ms. Fogelman "probably need a redo on the labeling."

25. On January 17, 2017, Ms. Fogelman told Mr. Cooper in no uncertain terms: "Ok, if you want to be taken seriously, these need to be absolutely redesigned. That is coming from my eye, the eye of my beer nerd friend and below are professional comments from my VP, Creative." Recognizing that it would be virtually impossible to achieve Mr. Cooper's ultimate goals without redesigning the can labels, Ms. Fogelman, told Mr. Cooper, "[h]appy to take this project on, or find another designer to do it the right way, I don't care.  But having killer can design will make a huge difference."

26. When Mr. Cooper expressed reluctance as to the importance of redesigning the labels, Ms. Fogelman reiterated, "[a]gain, I don't care if we do it or you have someone else, this isn't me trying to make more $, it's about doing all we can to position these as super cool beers and you as a bad ass."

27. After putting in significantly more hours than anticipated researching into Hopsters' brand, reputation, and target market, and drafting a comprehensive marketing plan to achieve Mr. Cooper's objectives, Mr. Cooper reneged on his willingness to spend additional resources as discussed in his original e-mail correspondence with Marlo Marketing.   Concerned about this change in direction, Ms. Fogelman contacted Mr. Cooper via e-mail on January 13, 2017, stating:

So the team filled me in on the mtg yesterday. If this was all you
wanted, we could have saved a lot of time in preparing for the
mtg☺

Just want to be CRYSTAL CLEAR that this new direction is
completely the opposite of your original direction: "I want cool,
original ideas and I want a pioneer narrative that makes Hopsters
authentic and me a bad ass!" Your directed approach yesterday
will not succeed in making Hopsters authentic and you a bad ass.
So long as we're on the same page with that, we're good to
continue and we're more than happy to follow this direction but I
do not want you coming back to me in 6 months and say we did
not do our job.  As I said in our original correspondence, "it is
imperative that you actually listen to us and heed our counsel."
This is not doing so, at least based on your original direction.

28.     On February 18, 2017, Hopsters, through Mr. Cooper, retained Marlo Marketing

to design the beer can labels, a brand guide, and New England IPA webpage ("Label Project").

29.     Marlo Marketing estimated that the Label Project would cost $9,750.  In that

estimate, Marlo Marketing estimated that designing the beer can labels alone would cost $7,500,

which was far below the $20,000 Marlo Marketing would have normally charged.  In fact, the

entire estimate deeply discounted the true cost of the Label Project.  (Indeed, on the beer can

labels alone, Marlo Marketing ultimately provided Hopsters with $11,875 in services.)

However, given the indispensability of the beer can designs to Hopsters' (and Mr. Cooper's)

short-term and long-term goals, Marlo Marketing offered to complete the Label Project for far

less than its normal rates.

30.     Mr. Cooper paid Marlo Marketing $4,875 in advance for the Label Project.

**Mr. Cooper Unleashes an Angry, Abusive Tirade on Marlo Marketing Staff**

31.     Marlo Marketing consulted Mr. Cooper for input and approval at every point in

the public relations campaign and the Label Project, many times in writing.

32.     Between February and April of 2017, Marlo Marketing designed labels for Hopsters' Comet Citra and Newtonian beers.

33.     With respect to the Newtonian beer can design, Mr. Cooper requested that Marlo Marketing to change the background color, but otherwise approved of the design concept and details proposed by Marlo Marketing.

34.     However, on April 13, 2017, despite his earlier approval of the design and despite his obligation and promise to not mistreat Marlo Marketing staff, Mr. Cooper demanded, in an abusive, demeaning, and insulting tirade, that Marlo Marketing redesign the Newtonian can label at no charge or provide him with the label so he could hire someone else to redo it.

35.     Based on Mr. Cooper's mistreatment of Marlo Marketing's staff, Marlo Marketing terminated its relationship with Hopsters.

36.     At that point, Marlo Marketing had provided Hopsters with $40,325 in public relations services.

37.     In addition, at the time of termination, Hopsters owed Marlo Marketing additional money for the beer can designs and website services.  Hopsters has not paid that outstanding balance.

## Marlo Marketing's Copyrighted Artwork

38.     Marlo Marketing authored the artwork depicted below relating to a "Comet Citra" variety of beer (the "Comet Citra Asserted Artwork") (attached as Exhibit 3).



39.     Marlo Marketing retains ownership of all right, title and interest in the copyright for the Comet Citra Asserted Artwork.

40.     The Comet Citra Asserted Artwork was made the subject of an application which matured into United States Copyright Registration Certificate No. VA 2-066-801 (attached as Exhibit 4).

41.     Marlo Marketing authored the artwork depicted below relating to a "Newtonian" variety of beer (the "Newtonian Asserted Artwork") (attached as Exhibit 5).



42.     Marlo Marketing retains ownership of all right, title and interest in the copyright for the Newtonian Asserted Artwork.

43.     The Newtonian Artwork was made the subject of an application which matured into United States Copyright Registration Certificate No. VA 2-066-800 (attached as Exhibit 6).

**Hopsters' Unauthorized Use of the Asserted Artwork**

44.     On information and belief, starting on or around June 21, 2017, Hopsters misappropriated and has been using the Comet Citra Asserted Artwork as labeling on its beer cans for "Comet Citra New England IPA."  The Comet Citra New England IPA is available for sale from at least Hopsters Brewery and is depicted below.



45.     On information and belief, starting on or around June 21, 2017, Hopsters

misappropriated and has been using the Newtonian Asserted Artwork as labeling on its beer cans

for "Newtonian New England IPA."  The Newtonian New England IPA is available for sale from

at least Hopsters Brewery and is depicted below.



46.     Hopsters continues to promote and sell beer cans that depict the Comet Citra Asserted Artwork from at least its brewery located in Newton.

47.     Hopsters continues to promote and sell beer cans that depict the Newtonian Asserted Artwork from at least its brewery located in Newton.

48.     Hopsters has never been and is not currently licensed or otherwise authorized by Marlo Marketing to copy, distribute and/or use the Comet Citra Asserted Artwork.

49.     Hopsters has never been and is not currently licensed or otherwise authorized by Marlo Marketing to copy, distribute and/or use the Newtonian Asserted Artwork.

## COUNT I

## COPYRIGHT INFRINGEMENT

50.     Marlo Marketing repeats and re-alleges the allegations of the paragraphs above as though fully set forth herein.

51.     Hopsters has infringed, and continues to infringe, Marlo Marketing's copyrights in the Comet Citra Asserted Artwork and the Newtonian Asserted Artwork in violation of 17 U.S.C. § 501, by copying, distributing, and/or using both pieces of Artwork without license or other authorization.

52.     On information and belief, Hopsters' infringement has been knowing and willful.

53.     Hopsters' infringement has damaged Marlo Marketing in an amount to be proven at trial.

54.     Unless stopped by an injunction, Hopsters will continue infringing Marlo Marketing's copyrights in the Comet Citra Asserted Artwork and the Newtonian Asserted Artwork and will cause Marlo Marketing to suffer irreparable harm for which there is no adequate remedy at law.   Therefore, Marlo Marketing is entitled to injunctive relief.

## COUNT II

## FRAUD IN THE INDUCEMENT

55.     Marlo Marketing realleges and incorporates herein all of the foregoing allegations.

56.     Mr. Cooper told Marlo Marketing that Hopsters would forfeit the $60,000 retainer Hopsters paid Marlo Marketing if Mr. Cooper mistreated Marlo Marketing staff.

57.     Mr. Cooper made that statement to induce Marlo Marketing to provide services to Hopsters.

58.     Mr. Cooper knew that the promise to forfeit the $60,000 retainer if he mistreated Marlo Marketing staff was false.

59.     Marlo Marketing, in reliance on Mr. Cooper's misrepresentation, provided public relations services to Hopsters.

60.     Marlo Marketing's reliance was to its detriment because, among other things, Hopsters has filed a lawsuit against Marlo Marketing for retaining the $60,000 retainer.

61.     Marlo Marketing has sustained damages as a direct and proximate result of Mr. Cooper's fraudulent misrepresentations.

## COUNT III

## BREACH OF CONTRACT

62.     Marlo Marketing realleges and incorporates herein all of the foregoing allegations.

63.     Marlo Marketing and Hopsters had a valid contractual agreement whereby Hopsters would pay Marlo Marketing for beer can label design and website services.

64.     Marlo Marketing fulfilled its obligations under that agreement by rendering such services.

65.     Hopsters has breached its obligations by not paying Marlo Marketing the outstanding balance for those services.

66.     Hopsters' breach of the parties' agreement has caused injury to Marlo Marketing.

## COUNT IV

### UNJUST ENRICHMENT

67.     Marlo Marketing realleges and incorporates herein all of the foregoing allegations.

68.     At Hopsters' request, Marlo Marketing provided Hopsters with beer can label design and website services.

69.     Hopsters has only partially paid Marlo Marketing for those services.

70.     Hopsters has been unjustly enriched.

## COUNT V

### PROMISSORY ESTOPPEL

71.     Marlo Marketing realleges and incorporates herein all of the foregoing.

72.     Mr. Cooper told Marlo Marketing that Hopsters would forfeit the $60,000 retainer Hopsters paid Marlo Marketing if Mr. Cooper mistreated Marlo Marketing staff.   Mr. Cooper's statement is a clear and definite promise Marlo Marketing is entitled to enforce.

73.     Mr. Cooper's statement foreseeably caused Marlo Marketing to reasonably rely upon it and detrimentally change its position in reliance thereon.

74.     As a direct and proximate result of Mr. Cooper's representation, Marlo Marketing has suffered and continues to suffer injury.

## COUNT VI

### ABUSE OF PROCESS

75.     Marlo Marketing realleges and incorporates herein all of the foregoing allegations.

76.   Hopsters has misused process to pursue an ulterior motive by filing its Complaint and having it served on Marlo Marketing.

77.   Hopsters did so knowingly and with malice.

78.   Marlo Marketing has been damaged by Hopsters' actions.

## COUNT VII

## VIOLATION OF M.G.L. C. 93A

79.   Marlo Marketing realleges and incorporates herein all of the foregoing allegations.

80.    Marlo Marketing and Hopsters were engaged in trade and commerce at relevant times.

81.   Hopsters' conduct as described above constitutes unfair and deceptive acts and practices in violation of M.G.L. 93A.

82.   Hopsters willfully and knowingly committed these unfair and deceptive acts and practices.

83.   Hopsters' unfair and deceptive acts and practices occurred primarily and substantially within the Commonwealth of Massachusetts, including but not limited to the acts and practices carried out by Mr. Cooper, who resides and has a primary place of business in Massachusetts.

84.   Marlo Marketing has suffered the loss of money and/or property, including legal fees, as a result of the unfair and deceptive acts and practices of Hopsters and Mr. Cooper, for which Hopsters is liable.

85.   Marlo Marketing is entitled to recover multiple damages.

86.     Marlo Marketing has suffered and will suffer substantial harm as a result of Hopsters' actions.

## Prayer for Relief

WHEREFORE, Marlo Marketing requests that the Court award the following relief:

A.     Enter judgement for Marlo Marketing on all Counts of the Complaint and Counterclaims.

B.     Award Marlo Marketing actual and compensatory damages.

C.     Award Marlo Marketing attorneys' fees and costs.

D.     Award Marlo Marketing attorneys' fees and costs pursuant to G.L. c. 93A.

E.     Award Marlo Marketing multiple damages pursuant to G.L. c. 93A.

F.     Award Marlo Marketing interest.

G.     Enter judgment that Hopsters infringed Marlo Marketing's copyright in and to the Comet Citra Asserted Artwork, pursuant to 17 U.S.C. § 501.

H.     Enter judgment that Hopsters infringed Marlo Marketing's copyright in and to the Newtonian Asserted Artwork.

I.     Permanently enjoin Hopsters, including its partners, officers, agents, servants, employees, attorneys, and all those persons and entities in active concert or participation with them, from further infringement of the copyrights in and to the Comet Citra Asserted Artwork and the Newtonian Asserted Artwork, pursuant to 17 U.S.C. § 502.

J.     Order the recall, impounding, and destruction of all infringing copies made, used or distributed by Hopsters in violation of Marlo Marketing's exclusive rights in and to the Comet Citra Asserted Artwork and the Newtonian Asserted Artwork (and, in the

case of electronic copies, order that all such copies be deleted from the computers or other storage means on which they reside), pursuant to 17 U.S.C. § 503.

K.    Direct Hopsters to pay to Marlo Marketing the actual damages suffered by Marlo Marketing and any additional profits realized by Hopsters, pursuant to 17 U.S.C. § 504.

L.    Order that, in the alternative to actual copyright damages, at Marlo Marketing's election, Hopsters shall pay Marlo Marketing statutory damages and enhanced for Hopsters' willful infringement, pursuant to 17 U.S.C. § 504.

M.    Order Hopsters to file and serve a report in writing, and under oath, setting forth the manner and form in which Hopsters has complied with the Court's order and injunction.

N.    Award Marlo Marketing its legal fees and costs in prosecuting this action, pursuant to 17 U.S.C. § 505.

O.    Award Marlo Marketing such further relief as this Court may deem just and proper.

## JURY DEMAND

Marlo Marketing requests a jury trial on all claims which are triable to a jury.

**MARLO MARKETING COMMUNICATIONS, INC.**
By its Attorneys,

*[signature]*

C. Max Perlman (BBO #630395)
*max@hrwlawyers.com*
Charlotte M. Petilla (BBO #671126)
*cpetilla@hrwlawyers.com*
Hirsch Roberts Weinstein LLP
24 Federal Street, 12th Floor
Boston, Massachusetts 02110
(617) 348-4300

Dated: September 25, 2017

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on counsel of record for Plaintiffs by e-mail and first class mail on September 25, 2017.

Charlotte M. Petilla

# Exhibit 1

you're paying for, you listen and trust our counsel. That's not to say if we tell u to jump off a proverbial cliff that u do without question.

It's mutual strategy, allow us to execute as we know best. See u Tues.

Sent from my iPhone

On Jan 8, 2017, at 2:29 PM, Lee Cooper <lee.cooper@hopstersbrew.com> wrote:

I'll swing by your office on Tuesday afternoon with beer and check.  I'll check my behavior, however I want to be active in the strategic direction - with the caveat that you tell me to fuck off anytime and I'll also pay you in advance so I have no redress.

On Sun, Jan 8, 2017 at 2:17 PM Marlo Fogelman <mfogelman@marlomarketing.com> wrote:

Ok, here is contract. Same as last one, just different terms.

Please get it back to me tomorrow pls and Ann or Karen will be in touch to schedule a kick off mtg

Also, can you get me a couple samples of both this wk? A friend who has a craft beer shop in the East Village will be in town (to

visit Trillium, specifically).

Would like to get his opinion on the beers and get some thoughts from him....while I know you're not selling in NYC, it's these kind of ppl we're going to need to make sure "get" and appreciate the product.

Marlo Fogelman

# Exhibit 2



marlo

2017 public relations plan for

# HOPSTERS

January 30, 2017



marlo



# Hopsters: audience assessment

- Beer drinkers who **like to drink beer,** are **curious about beer** and **want to learn more**

- Down to earth; **not snobby** about beer ("the 99%")

- **Affluent;** have disposable income to spend on a night out or a brew session

- **Late 20's to mid 40's**

- Professionals, entrepreneurs, often in **biotech, engineering, financial services** fields

3

# Hopsters: brand pillars & current mission statement



HOPSTERS

*"The experimental leader in Boston's craft beer movement"*

**Pioneering**

**Accessible**

**Inclusive**

**Well-crafted**

**Fun**

marlo

4



# Hopsters: brand name analysis

**Strengths**
- Equity built around name since brewpub launch; bolstered by WeFunder support

**Challenges**
- Lack of awareness and clarity around what exactly Hopsters is (restaurant? brew your own? craft beer?)
- Evokes cute/juvenile image; not in keeping with more sophisticated current craft brewery landscape
  - *"Just what the world needs...another beer brand featuring a 'hop' pun"* – NYC craft beer shop owner

**Proposed Branding Exploration: Introduce Separate Name Just for Beer Range**
- Keep the Hopsters name to represent the brew-your-own-beer experience
- Create new brand identity for craft beer offerings

**Pros**
- Distances craft offerings/NEIPAs from previous negative media coverage associated with Hopsters/Lee
- Reinforces fact that the craft beer offerings are separate from the brew-your-own beers
- Offers an opportunity to select a name that will be taken more "seriously" by the craft beer community
- Enables beers to flourish under standalone brand as a separate revenue stream
- New brand announcement will generate "news" amongst trade and consumers interested in new beers

**Cons**
- Complicates goal of making Hopsters/Lee synonymous with New England IPAs
- Potential loss of existing fans/customers who will not be familiar with the new brand
- The NEIPAs are currently sold only at Hopsters; separating them will not benefit either
- Change is irrelevant/unnecessary to vast majority of consumers unaware of prior negative press
- Beer community may view as a transparent attempt to shake off past issues with CBC and others

5

marlo

# Hopsters: brand name analysis

**Recommendation:** Keep Hopsters Newton and Hopsters Alley; lay the foundation for a future comprehensive rebrand by selecting a different name for the Seaport location

- **Cons**
  - Suggests that Lee is trying to hide from Hopsters and its previous reputation
  - Has potential to confuse loyal customers looking to experience Hopsters downtown
  - Poses potential issues with investors

- **Pros**
  - Sets a clean slate for Lee moving into a new space
  - Introduces a shiny new concept from the successful business based in Newton
  - Moves away from the juvenile and punny "Hopsters" name
  - Enables the brand to rise above and avoid correlation with Hopsters and its previous bad press and rep



2017 PR plan

marlo

# objectives

- Repair and reposition Lee's reputation as an innovative iconoclast within the craft beer industry

- Make Hopsters synonymous with New England IPAs (NEIPAs)

- Generate pre-opening interest in Hopsters' Seaport location

# strategies

- Draw attention away from social skirmishes by **embracing charity partnerships** and **giving back to the community**

- Redefine the Hopsters messaging hierarchy to reflect an **accessible brand** that **makes great beer** (specializing in **NEIPA**) and also **helps people brew great beer**

- **Take ownership of the NEIPA category** by tying it to Hopsters at every consumer touchpoint (website, beer labels, marketing collateral, etc.) and establishing **industry-leading NEIPA-focused events** to elevate the category into the mainstream

- **Enhance and leverage** owned media channels (social, newsletter) to **galvanize the existing Hopsters fanbase**

- **Bypass traditional beer media relations** in favor of direct-to-consumer events and influencer seeding

- **Shift communications focus** from Lee to the **brand** and **quality of the beer/s**

marlo





marlo

# Hopsters 2017

I.   Brand Redefinition

II.  Reputation Management

III. New England IPA Week

IV.  Influencer Seeding

V.   Suburbs to Seaport

VI.  Ongoing Efforts

# I. brand redefinition

## *Reposition the Brand*

- **Rewrite the Hopsters story** to accurately reflect the brand's evolution from a brew-your-own brewpub to a leader in the craft beer space, specifically in the NEIPA category
  - Revise language on labels/website/menus, etc.

- **Play up the accessibility of Hopsters** as an approachable brand where you can *drink* great beer, *make* great beer and *just have FUN*
  - Differentiates Hopsters from other holier-than-thou craft NEIPA-producers that may be intimidating

- **Own NEIPA positioning** by updating all collateral to focus on this Hopsters specialty
  - Dedicated NEIPA section on website
  - Updated language in social media bios/pages
  - Sell sheets, pop-up banners, flyers, "What is NEIPA?" educational takeaway cards, NEIPA visit cards, etc.



12

marlo

# I. brand redefinition

## *Rebranding & Collateral Redesign*

- Hopsters will only become synonymous with New England IPA through **repeated association with the category**, starting with existing materials and owned-media channels, e.g.,

  – Hopsters Comet Citra **New England IPA**

  – Hopsters Newtonian **New England IPA**

- Hopsters must also gain credibility in the craft beer space by elevating its overall creative aesthetic to align with an industry that places a **heavy premium on artwork and design**

- Consider new name variation for Seaport location to lay foundation for future rebrand



marlo

13

# II. reputation management





## *Community Tuesdays*

- **Begin to rebuild Lee's positive reputation** by designating the first Tuesday of every month as "Community Tuesday" with a portion of NEIPA sales going toward a New England-based non-profit or cause

  - Charity partner enjoys complimentary appetizers and/or Hopsters donates 10% of total group bar tab to the organization
  - Drives **brand ambassadorship** among select categories and encourages trial of Comet Citra and The Newtonian

- Choose charity partners based on seasonal relevance (e.g., Boston Marathon Charity Program in April, New England Center for Homeless Veterans around 4th of July)

- Kick off the program by **supporting a group directly threatened by Donald Trump** (New England Foundation for the Arts, Planned Parenthood, Sierra Club Massachusetts, etc.)

  - Bring back the popular "Trump Sucks Ass Ale" for the night
  - Service photos after the session to local community papers

14

marlo



# II. reputation management

## *Reigniting the Hopsters Fanbase*

- **Enhance and leverage existing assets** and Hopsters-owned media channels currently in place to **activate and reengage** those who have already shown affinity for the brand

- **Send monthly newsletter** out to database of 20K subscribers
  - Feature specials, promotions, events, Seaport updates, etc.
    - February focus on Sip 'n Shop/Comet Citra and Newtonian, March focus on Community Tuesdays, etc.

- Reach out to those who have **visited Hopsters or rated Hopsters beers favorably on Untappd**
  - Engage with "fans" to keep the conversation going and **make them feel part of the Hopsters community**

15

# II. reputation management

## *Reigniting the Hopsters Fanbase: Social Media*

- marlo will take the reins of Hopsters' social media accounts, using Facebook/Twitter as **platforms for NEIPA education,** and positioning Hopsters as a **craft beer innovator** and **custodian of the New England IPA**

- Create ongoing content that serves as a **constant source of information about NEIPAs and Hopsters,** including:

  – Upcoming activations, specials and events

  – Fun infographics about different IPA styles

  – Lee Cooper-inspired quotes and mottos

  – Complementary "Drink Like a New Englander" ad campaign visuals (slide 15)

  – Celebrations of fun unique New England beer milestones, e.g., the opening of Boston's Warren Tavern in1780



**Hopsters**
@HopstersBrew

Hopsters is Boston's first and only custom craft brewery, bar and restaurant. Enjoy yourself while you master the art and science of handcrafted beer!

Boston, MA
hopstersbrew.com
Joined February 2013

marlo

marlo

# II. reputation management

## *Reigniting the Hopsters Fanbase: Social Media*

- Encourage Hopsters fans to **take selfies with a Comet Citra or Newtonian crowler in front of "classic" New England landmarks** from every state, e.g.,

  – Lighthouse in MA, lobster trap in ME, Newport mansion in RI, maple tree tap in VT, Yale University campus in CT, White Mountain range in NH (or a moose...or bear!)

  – Ongoing to constantly generate fun new content

- Customers who **post photos on social media and tag @HopstersBrew** will be retweeted/featured on Hopsters' social media pages

  – Offer surprise and delight Hopsters swag for those who tag more than one photo

# III. introducing New England IPA week

New England IPA WEEK



marlo

Hopsters joins other **NEIPA-producing New England breweries** to host the first-ever **New England IPA Week,** celebrating the hottest category in the beer industry right now

• New England IPA Week includes:

– **Kickoff tasting event** at **The Boston Public Market Kitchen** featuring leading New England breweries

– Special industry guest **speakers**

– New England-themed **pairing menu** at Hopsters Newton (and other participating accounts)

– Awareness-driving **ad campaign**

– Customized **social media** content

– **Drizly** delivery and content **partnership**

– **"WTF is NEIPA"** materials/giveaways

**NOTE:** www.NewEnglandIPA.com URL is currently available

18





# III. introducing New England IPA week

- Breweries from across New England will **pour exclusively at The Boston Market Kitchen** for a ticketed grand kickoff night

  - 2-3 lead sponsors host alongside Hopsters; additional supporting brands may also come on board

  - Invite only other producers of fine NEIPAs so that **Hopsters is included as part of the consideration set**

  - Partner breweries will receive coveted exposure to Boston consumers (in-person and via website/materials inclusion)

  - Consumers will taste and learn more about NEIPAs from Lee/John and partner breweries at this can't-miss event

- NEIPA tastings continue all week long at **Hopsters Alley**, featuring participating brewers, taste tests (NEIPA vs. West Coast IPA, etc.) and giveaways, turning the Alley into the "home" of NEIPA

  - First 10 customers in each day receive NEIPA t-shirt, tote bag
    - ***NEIPA WTF?***

  - Branded takeaway cards explain ***"WTF is NEIPA??"***

# III. introducing New England IPA week

- Scaled down "year one" version of NEIPA Week could focus solely on Hopsters' NEIPAs served at Hopsters Alley

- Still positions Hopsters as a leader in the space and generates mainstream consumer awareness of the entire NEIPA category

  – Lower impact "buzz" in the market without halo effect of other participating breweries, but helpful as a foundation-building effort for bigger NEIPA weeks in the future

HOPSTERS

New England IPA WEEK





marlo

20



marlo

# III. introducing New England IPA week

- Hopsters Newton creates a **special NEIPA Week pairing menu** to complement the floral, citrus notes of the Comet Citra and Newtonian, featuring **a salute to famous dishes** from every New England state, such as:

  – **Connecticut** – New Haven-style pizza

  – **Massachusetts** – fried clams

  – **Maine** – lobster roll

  – **New Hampshire** - pot pies

  – **Rhode Island** – stuffed quahogs

  – **Vermont** – cheddar corn chowder

- Create and distribute **educational tasting cards** explaining the anatomy of an excellent NEIPA

- **Pre-promote NEIPA Week menu** (and Hopsters Alley activations) via table tents, menu/billholder cards

21

marlo

# III. introducing New England IPA week



## *Guest Speakers*

- Hopsters Newton hosts guest reading featuring **Lauren Clark, author of "Crafty Bastards,"** a history of beer in New England from the Mayflower to Modern Day

  – Lauren shares excerpts from her book and hosts an informal **"meet and sip"** with consumers interested in learning more about the history of regional beer

- Series could continue quarterly with **different guest speakers** who hail from New England and all **share a love and appreciation of premium craft beer,** e.g., Tom Acitelli, "The Audacity of Hops"

# III. introducing New England IPA week

## *Drink Like a New Englander*

- **Kick off NEIPA Week with a tongue-in-cheek ad campaign** featuring paintings of iconic New Englanders drinking Hopsters Comet Citra or Newtonian
  - Paul Revere, Salem witches, Pilgrims, Minutemen, lobsters, etc.

- Advance ads will be placed in **targeted Boston media outlets and in dedicated campaigns on social media,** including:
  - Facebook targeting "beer" fans
  - Instagram
  - *metro Boston*
  - Boston magazine online
  - Eater.com







marlo

23

# III. Introducing New England IPA week

## *Drizly Partnership*

- Create a custom partnership to **"own" New England IPA-related content** on the Drizly app, website, newsletters
  – Cements positioning of accessibility to consumers and aligns with a known brand in the region

- Offer **special NEIPA Week Drizly deliveries** of "just released" Hopsters Comet Citra and Newtonian crowlers/bottles delivered directly from Hopsters (Alley)
  – Limit two crowlers per person; allow advance reservations to **create sense of urgency**

- Create **branded Hopsters NEIPA cooler bags** for deliveries to highlight the meticulous care required to properly enjoy a Comet Citra or Newtonian
  – Include **freshness expiration date/time stamp** on packaging via branded hangtag or sticker

marlo

24

# IV. influencer seeding

- Target **self-proclaimed "beer nerds"** with special offers to try Comet Citra and Newtonian
  - Encourages **adoption of brand** and conversion to **brand ambassadorship**

- Invite **area beer groups/clubs** to Hopsters Newton and Hopsters Alley for guided tastings
  - Offer to host beer club meet-ups with complimentary appetizers and VIP tour of the brewing facility

- Extend similar invitations to local companies on the rise in target verticals **(tech, financial services, engineering**, etc.), with employees who are extremely active on social
  - Offer customized guided NEIPA tastings from Lee/John and educational "cheat sheets" at tables

- Seek **local notable brands/companies/accounts** to partner with special offers to have Hopsters' NEIPA on tap











25









marlo

# IV. influencer seeding

- Inject Hopsters into the craft beer conversation by participating in **high profile beer sampling events** that other respected breweries and beer fans attend, highlighting the Hopsters NEIPAs at every possibly occasion

    – WGBH Craft Beer Festival, Boston

    – Maine Beer Festival, Portland

    – New England Brewfest Craft Beer Weekend, NH

- Materials and collateral featuring NEIPA language will **continue to establish Hopsters as the leader** within the up and coming category

- Participate in high-profile non-beer local events as a **sponsor and/or exhibitor** to gain additional exposure among local influencers in target verticals, e.g.,

    – TUGG *Tech Gives Back*

    – *Boston* magazine Best Fest

    – *BostInno* 50 on Fire or BostonFest

26

marlo



# V. suburbs to seaport

- As the Seaport opening draws near, begin to seed stories about the impending launch, focused on business, real estate, food, etc.
  - Continue to refrain from traditional beer media outreach

- Offer advance previews of the space to select media targets, particularly those who have been "faithful" to the brand from the beginning
  - Use exclusive content/access as an olive branch to targets who may have been previously spurned (e.g., Alex Weaver of *BostInno*)

- Take the temperature of beer media when Seaport opens to determine next steps in offering up access to Lee...

27

marlo



# V. suburbs to seaport

## The Brash Brit is Back
*The bad boy of New England craft beer plants a stake in the Seaport with his second brewpub*

- "Reintroduce" Lee Cooper in a style that is authentically Lee – individual, irreverent, edgy, cheeky

- Pitch regional profile stories in the lead-up to the Seaport opening, showcasing Lee's nontraditional path to craft beer success in the region
  - Focus on commitment to brewing superior NEIPAs

- Lee to discuss growth trajectory of Hopsters, the crowdfunding, the reason for expanding to the Seaport, and his vision for national expansion

- Continue to bypass traditional beer media in favor of business, consumer lifestyle or even real estate targets and press opportunities





# VI. ongoing efforts

## *Keeping Hopsters Top of Mind: Ongoing Gift Pitching*

- Highlight "freshness" of Hopsters' NEIPAs by creating special gifting packages of the crowlers or growlers
  – Akin to sending fresh flowers on Mother's Day; gift the beer lover in your life a bouquet of Hopsters Comet Citra or Newtonian
  – Feature on website, social media and in newsletter

- Capitalize on popular experiential gifting trend to promote Hopsters Newton's brewing sessions for various occasions throughout the year, such as:
  – College graduation
  – Mother's Day
  – Father's Day
  – 4th of July

- Pitch Hopsters brewing sessions for inclusion in seasonal gift guide and roundups in the following publications: *The Boston Globe, Metro Boston, WHERE Boston, Boston.com,* etc.

29

marlo

# tactical rollout

| | Jan | Feb | Mar | Apr | May | Jun | Jul |
|---|---|---|---|---|---|---|---|
| Brand Redefinition/Collateral Update | | ■ | | | | | |
| Community Tuesdays (March launch) | | | ■ | ■ | ■ | ■ | ■ |
| New England IPA Week (April or May) | | | | | ■ | ■ | ■ |
| Social Media | | ■ | ■ | ■ | ■ | ■ | ■ |
| Monthly Newsletters | | ■ | ■ | ■ | ■ | ■ | ■ |
| Influencer Seeding | | ■ | ■ | ■ | ■ | ■ | ■ |
| Seaport Launch Seeding | | | | | | ■ | ■ |

# estimated budget (1/2)

**Core PR Program**
- Message Development
- Media relations (gifting, Seaport seeding, reactive, etc.)
- Social media (3x posts per week – FB/Twitter)
  - Social media photography & management (OOP)
- Community Tuesdays (1x charity per month; 1x kickoff meet/greet in March)

    $60,000 ($10K/month)

    $5,000 (8 hr. shoot/month)

**Incremental Projects**
- Ongoing influencer seeding (beer/corporate outreach; 1-2 "events"/month)

    $15,000 (24 hours/month)

**NEIPA Week Management & OOP**
- Agency fee
  - Fee for scaled down "year one" version
- Guest speaker fee (e.g., Lauren Clark)
- Advertising (FB, IN, metro, Eater, Digboston, etc.)
- Branded signage/educational cards (1000 qty.)
- Drizly partnership
  - Branded insulated delivery bags
  - Branded tote bags
  - Branded T-shirts

    $50,000
    $25,000
    $150
    $5,000
    $155
    TBD
    $350
    $200
    $500

marlo

31

marlo



# Exhibit 3

# HOPSTERS BREWING COMPANY

**GOVERNMENT WARNING:** (1) according to the surgeon general, women should not drink alcoholic beverages during pregnancy because of the risk of birth defects. (2) consumptions of alcoholic beverages impairs your ability to drive a car or operate machinery, and may cause health problems.



## COMET CITRA

### NEW ENGLAND IPA

A tropical juice bomb made with Comet and Citra hops resulting in a balanced brew with a splash of bright grapefruit and luscious undertones of mango and papaya

## THE HOPSTERS STORY

Hopsters Brewing Company is Boston's leading experimental craft brewery specializing in juicy, hazy New England IPAs as well as dozens of other small-batch styles available in our brewpub.

We continually experiment with new hop flavors to brew the freshest and most accessible New England IPAs in the area, raising the bar for category quality and innovation. We believe drinking beer should be fun, so we're committed to making our beers approachable and our brewpub welcoming.

We brew our New England IPAs weekly to ensure peak freshness in every sip. For the best taste at home, keep this beer refrigerated and drink within one week of brewing.

Visit us at 292 Centre Street, Newton, Massachusetts or www.hopstersbrew.com.

**ABV: 5.5% 16oz.**

# Exhibit 4

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayzn Tayle Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**

# VA 2-066-801

**Effective Date of Registration:**
September 12, 2017

---

## Title

**Title of Work:** Comet Citra IPA, branding and label design

## Completion/Publication

**Year of Completion:** 2017
**Date of 1st Publication:** September 11, 2017
**Nation of 1st Publication:** United States

## Author

- **Author:** Marlo Marketing Communications, Incorporated
  **Author Created:** 2-D artwork
  **Work made for hire:** Yes
  **Citizen of:** United States
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** Marlo Marketing Communications, Incorporated
38 Chauncy Street, 3rd Floor, Boston, MA, 02111, United States

## Certification

**Name:** Joshua Miller
**Date:** September 12, 2017
**Applicant's Tracking Number:** F0799.80001US00

# Exhibit 5

# HOPSTERS BREWING COMPANY



**GOVERNMENT WARNING:** (1) according to the surgeon general, women should not drink alcoholic beverages during pregnancy because of the risk of birth defects. (2) consumptions of alcoholic beverages impairs your ability to drive a car or operate machinery, and may cause health problems.



## NEWTONIAN

### NEW ENGLAND IPA

Hazy, double IPA bursting with mango, grapefruit, pineapple and peach from Citra and Amarillo hops and evenly balanced with Galena hop spice

## THE HOPSTERS STORY

Hopsters Brewing Company is Boston's leading experimental craft brewery specializing in juicy, hazy New England IPAs as well as dozens of other small-batch styles available in our brewpub.

We continually experiment with new hop flavors to brew the freshest and most accessible New England IPAs in the area, raising the bar for category quality and innovation. We believe drinking beer should be fun, so we're committed to making our beers approachable and our brewpub welcoming.

We brew our New England IPAs weekly to ensure peak freshness in every sip. For the best taste at home, keep this beer refrigerated and drink within one week of brewing.

Visit us at 292 Centre Street, Newton, Massachusetts or www.hopstersbrew.com.

ABV: 5.5% 16oz.

# Exhibit 6

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Tegh Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**

**VA 2-066-800**

**Effective Date of Registration:**
September 12, 2017

## Title

**Title of Work:** Newtonian IPA, branding and label design

## Completion/Publication

**Year of Completion:** 2017
**Date of 1st Publication:** September 11, 2017
**Nation of 1ˢᵗ Publication:** United States

## Author

- **Author:** Marlo Marketing Communications, Incorporated
  **Author Created:** 2-D artwork
  **Work made for hire:** Yes
  **Citizen of:** United States
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** Marlo Marketing Communications, Incorporated
38 Chauncy Street, 3rd Floor, Boston, MA, 02111, United States

## Certification

**Name:** Joshua Miller
**Date:** September 12, 2017
**Applicant's Tracking Number:** F0799.80002US00